COURT OF APPEALS
DECISION
DATED AND FILED

October 16, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2018AP922**

Cir. Ct. No. 2007CF357

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT III**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

JAMES E. EMERSON,

   DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Marathon County: GREGORY J. STRASSER, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   James Emerson appeals from an order denying his postconviction motion, filed pursuant to WIS. STAT. § 974.06 (2017-18),[1] seeking relief from a conviction for first-degree intentional homicide.   Emerson claims: (1) his constitutional right to confront the witnesses against him was violated by the admission of an out-of-court statement about Emerson made by a third party that was referenced by a police detective during Emerson's interrogation; and (2) his trial counsel provided ineffective assistance by failing to investigate or present meaningful mitigation evidence at sentencing.   We conclude the circuit court properly denied Emerson's postconviction motion without a hearing because the record conclusively demonstrates that he is not entitled to relief on either claim.   Therefore we affirm.

## BACKGROUND

¶2     Rhonda Mertes was beaten to death in the early morning hours of December 4, 1999.   She had left a bar when it closed at 2:10 a.m.   When her body was found by joggers later that day, her clothes and underwear were ripped, her pants were around her knees, and her face had been battered beyond recognition. The state crime laboratory analyzed blood samples from the scene, but it was not able to isolate any DNA profile other than the victim's.   Police interviewed a number of people who had left the bar at about the same time as Mertes, including Emerson, and followed up on numerous other tips and leads, but their initial investigation could not conclusively link anyone to the crime.

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

¶3      In 2005, following a number of advancements in DNA technology, police resubmitted to the state crime laboratory evidence that had been collected from the crime scene.  This time, the state crime laboratory was able to isolate Y-STR DNA evidence (a set of genetic markers passed identically from father to son on the Y chromosome) on two items—the victim's underwear and her fingernail clippings.  In addition, an FBI laboratory was able to identify mitochondrial DNA (a set of genetic markers passed identically from mother to child) from a pubic hair found on Mertes' body.  Based upon this new evidence, the police began to reinterview people from their original investigation and to request voluntary DNA samples.

¶4      During a reinterview with Emerson, the following exchange occurred between a police detective and Emerson:

> Q: Okay.  What we're asking James is that, um, everyone we talk to, because we do now have some evidence ….
>
> A: Mm-hm.
>
> Q: … which will allow us to do two things, one, help us convict the person responsible for the crime with DNA evidence ….
>
> A: Sure.
>
> Q: … but just as important – and – and I don't want you to freak out because I'll tell you this.  This is not the only situation like this that we're dealing with where someone said hey, this person told me that they did it.  Okay?  But we're asking that everyone we talk to provide us with a sample of their DNA for comparison with our evidence from that crime.  And – and I tell everyone that if you didn't have anything to do with her and didn't kill her, then you don't have anything to worry about whatsoever.  So is – would you be willing to provide us with a sample of your DNA?
>
> A: What – what – no, it doesn't matter.  Yeah.
>
>   ….

> Q: So basically what I want to be able to do, James, is say James Emerson came in, told us he doesn't know what the hell anyone's talkin' about, was cooperative, gave us a sample of his DNA. We compare your DNA – or the crime lab does – to the DNA from the crime scene. They don't match. Your name gets crossed off the list.

James then agreed to provide a buccal swab for DNA testing.

¶5 Members of the state crime laboratory tested buccal swabs from over fifty people who may have had some connection or contact with Mertes, and the lab eliminated all but Emerson as potential contributors to the DNA samples from the nail clippings and underwear. There was no other potential match to those samples from any profile in the state crime laboratory's database. Emerson's Y-STR DNA profile contained matches for all twelve markers examined from samples taken from the fingernail clippings and underwear. The FBI laboratory also determined that Emerson's mitochondrial DNA was consistent with that in the pubic hair it tested.

¶6 At trial, in addition to the above DNA evidence, the State presented evidence from two prisoners who said that while in jail Emerson had told them that he had killed Mertes. Elmer Allen testified he had met Emerson while on E Block in the county jail, and that Allen had attempted to give Emerson advice about his defense and how to explain away DNA evidence. Emerson told Allen that he had gone off with Mertes to smoke marijuana after leaving the bar, had hit her in the head with a brick to force her to have sex with him, and then hit her head with the brick again when she cried and continued to say she did not want to do this. Allen also reported hearing Emerson muttering to himself "Why did I hit that lady?" on multiple occasions while Emerson was pacing.

¶7    Timothy Sliwicki testified he had known Emerson for about ten years, had socialized with him on occasion, and had introduced Emerson to Mertes at the same bar she had been at on the night of her murder. On one occasion approximately six months before the murder, Sliwicki observed Emerson and Mertes talking together for about thirty minutes at the bar, and he then went out and smoked marijuana with them in a van. On another occasion after that, Sliwicki gave Emerson marijuana at the bar and watched him leave with Mertes to go smoke it. Sliwicki subsequently spoke with Emerson in the county jail. After initially denying that he ever knew Mertes (which Sliwicki knew to be untrue), Emerson eventually told Sliwicki that he did not mean to kill her, that she was not supposed to get hurt, and that he did not mean to hit her that hard.

¶8    The State also presented other acts evidence from three women who described encounters they had with Emerson.[2] Jane testified she encountered Emerson at a fireworks display where he approached her, boxed her in, and told her that he wanted to beat her up with a baseball bat, shoot her up with drugs, and "fuck the shit" out of her. Rachel and Veronica testified that they were walking toward their car to go home one evening when Emerson pulled alongside them in a car and tried to talk them into going to a bar or hotel with him. When the women refused and walked away, Emerson exited his vehicle and followed them. He put his arms around Rachel and began kissing her and rubbing against her as she tried to push him away and told him to stop. Emerson then squeezed Rachel's breast, grabbed her hand and put it on his penis until Veronica was able to pull Emerson

---

[2] The other acts evidence involves potential victims of crimes. Pursuant to the policy underlying WIS. STAT. RULE 809.86(4), we will use pseudonyms for the names of each of the three women.

off Rachel.  Emerson then began kissing and fondling Veronica until Rachel was able to pull Emerson off Veronica.  The women were able to get into their car, but Emerson pushed his way into the car on top of Veronica and continued to grope both of them until they played along and agreed to meet him at a hotel so that he would return to his own car and they could drive away.

¶9    After the jury convicted Emerson, the circuit court sentenced him to life in prison without parole.  Regarding the severity of the crime, the court explained it gave significant weight to the fact that Emerson had taken a mother away from her children and to the "unimaginable horror" that Mertes would have endured as Emerson attempted to rape her and beat her to death.  The court acknowledged that Emerson had a fairly stable work history and appeared to be a devoted father, but it viewed the central aspect of Emerson's character for sentencing purposes to be that he was capable of beating another person to death in such a brutal fashion.

¶10    Emerson filed a postconviction motion challenging the admission of the transcript of his police interview and the other acts evidence described above, the denial of a venue motion, the impartiality of the jury, his trial counsel's effectiveness in several respects, and highly emotional comments made by Mertes' family at sentencing.  The circuit court denied the motion, and this court upheld the conviction on appeal.  *See* ***State v. Emerson***, No. 2011AP1028-CR, unpublished slip op. (WI App June 26, 2012).

¶11    Emerson then filed a second WIS. STAT. § 974.06 postconviction motion raising two new claims: (1) the detective's reference during a portion of Emerson's videotaped statement played for the jury as being a situation "where someone said hey, this person told me that they did it" constituted a confrontation

clause violation to which Emerson's trial counsel should have objected or which could be reviewed under the plain error doctrine; and (2) his trial counsel provided ineffective assistance by failing to present mitigation evidence at sentencing in the form of live testimony from Emerson's family and friends. The circuit court denied the second § 974.06 motion without a hearing, and Emerson appeals.

## DISCUSSION

¶12 In order to obtain a hearing on a postconviction motion, a defendant must allege material facts sufficient to warrant the relief sought. *State v. Allen*, 2004 WI 106, ¶¶9, 36, 274 Wis. 2d 568, 682 N.W.2d 433. In the context of a claim of ineffective assistance of counsel, that means the facts alleged would, if true, establish both that counsel provided deficient performance and that the defendant was prejudiced by that performance. *State v. Swinson*, 2003 WI App 45, ¶58, 261 Wis. 2d 633, 660 N.W.2d 12. A defendant proves prejudice by demonstrating there is a reasonable probability that, but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). No hearing is required, though, when the defendant presents only conclusory allegations or when the record conclusively demonstrates that he or she is not entitled to relief. *State v. Romero-Georgana*, 2014 WI 83, ¶30, 360 Wis. 2d 522, 849 N.W.2d 668. In the latter case, this court will review a circuit court's decision to deny a hearing under the erroneous exercise of discretion standard. *Id.*

¶13 Here, the record conclusively demonstrates Emerson is not entitled to relief on either of his claims because he cannot establish prejudice resulting

from his counsel's alleged errors. We therefore conclude the circuit court properly exercised its discretion in denying Emerson's motion without a hearing.[3]

## 1. Confrontation Clause

¶14 Emerson's videotaped statement to law enforcement was played for the jury. This included a portion of the taped interview which indirectly referenced a third party providing information to police about Emerson's confession. Emerson argues the reference to the third party statement was testimonial hearsay offered for the truth of the fact asserted—that Emerson confessed to killing Mertes. He argues the admission of this statement violated the confrontation clause and that his counsel performed deficiently by failing to object.

¶15 As to the confrontation clause issue, given the overwhelming evidence of Emerson's guilt, there is no reasonable probability that the exclusion of a detective's oblique reference during an interrogation regarding Emerson having told an unidentified person that he killed Mertes would have resulted in a different outcome at trial. To begin with, the jury was presented with evidence that Emerson confessed to two different people. If the jury noticed the detective's isolated comment in the midst of an eight-day trial, it could have assumed the detective was referring to one of those two people. Even if the jury recognized the detective was referring to an additional admission to a third person, there were no

---

[3] The State also argues that Emerson should be procedurally barred from raising his current confrontation clause claim because he did not raise it on his prior appeal. We need not address that argument in light of our conclusion that Emerson's allegations are otherwise insufficient to warrant a hearing.

further details provided that would have given that admission any significant weight beyond that from the other admissions that were properly before the jury.

¶16    Furthermore, Emerson fails to acknowledge the highly probative value of the DNA evidence against him. While there was insufficient biological material recovered from the crime scene to isolate a complete DNA profile other than the victim's, the crime scene samples contained markers consistent with Emerson's Y-STR *and* his mitochondrial DNA. Although neither set of markers was itself unique, it would be highly improbable for a random person to share an exact set of *both* paternal and maternal DNA markers. In short, the DNA evidence left no reasonable doubt as to Emerson's guilt, particularly when considered in conjunction with Emerson's admissions of guilt and the other acts testimony about his prior aggressive sexual conduct with women.

## 2. Sentencing Information

¶17    As to sentencing, Emerson provided an affidavit asserting that his wife, Soccoro Emerson, would have testified that Emerson was honest, hardworking, a loving father who spent time with his children, and that he was not the kind of person who would be capable of committing murder. Soccoro had never seen Emerson engage in altercations or other abusive behavior, and she believed he respected authority, got along well with others, and always treated women with respect.

¶18    Emerson's mother Annie Emerson would have testified that Emerson received good grades in school, sang in the choir, and that he was a very spiritual person who loved his wife and family. Emerson's sister Jackie Watkins would have testified that Emerson was a quiet and respectful person who always looked out for his sisters and took time out for others, that he was not a violent

person, and that he never got in trouble growing up. Emerson's sister Debra Webster would have testified that Emerson was a very loving husband and father, who always treated women with respect, and was not the type of person capable of committing murder. Emerson's sister Terri Stovall would have testified that Emerson loved his family and was very protective of his sisters.

¶19 Emerson's former work supervisor Mark Wisnewski would have described Emerson as responsible, honest, hardworking, dependable, knowledgeable, trustworthy, kind, courteous, friendly, outgoing, and well-liked by most of his co-workers. Emerson's former work supervisor Karl Lang would have described Emerson as very focused, responsible, trustworthy, well-spoken, and honest. Lang would also have testified that Emerson generally got along with his co-workers and was well liked and that he did not recall Emerson ever having any disciplinary problems.

¶20 Emerson's friend Cathy Kraus would have testified that Emerson had a lot of friends and was well-liked, that he was a good father, and that he always treated women with respect. Emerson's friend Anthony Milanowski would have testified that Emerson was a good father, that he was hard working, responsible and honest, that he was well-liked and had a lot of friends, that he would "give the shirt off his back to help someone out," and that Milanowski would trust Emerson with his family.

¶21 Emerson argues that the presentation of live testimony from these family members, co-workers, and friends would have been relevant to the disputed issue of his character and rehabilitative potential, and that there is a reasonable probability that this live testimony would have convinced the circuit court to provide him with the possibility of parole. We disagree.

¶22 At the sentencing hearing, Emerson's trial counsel presented three letters from character witnesses—Emerson's wife, a jail ministry worker, and a neighbor—in support of an argument that Emerson's potential for rehabilitation warranted a determination of eligibility for supervised release. The circuit court acknowledged the information in those letters when it noted that Emerson had a "responsible work history" and was a "devoted father." The court simply viewed the facet of Emerson's character that had been revealed by his commission of this brutal crime and his prior failures on supervision as more significant than his work history or relationships with family and acquaintances. Moreover, the court was entitled to weigh the seriousness of the offense more heavily than Emerson's rehabilitative potential, as it apparently did. In sum, we see no reasonable probability that presenting live testimony from character witnesses on Emerson's behalf regarding his rehabilitative potential would have persuaded the circuit court to grant Emerson eligibility for supervised release.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.